# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Mohsen A. Baddourah, as a member of the City Council of the City of Columbia, Appellant,

v.

Henry McMaster, in his capacity as Governor for the State of South Carolina, Respondent.

Appellate Case No. 2017-002576

---

Appeal from Richland County
G. Thomas Cooper Jr., Circuit Court Judge

---

Opinion No. 28013
Heard October 14, 2020 – Filed March 10, 2021

---

## AFFIRMED AS MODIFIED

---

Tobias G. Ward Jr. and J. Derrick Jackson, of Tobias G. Ward, Jr., PA, Joseph M. McCulloch Jr., and Kathy R. Schillaci, all of Columbia, for Appellant.

Thomas A. Limehouse Jr., of Office of the Governor, of Columbia, for Respondent.

---

**CHIEF JUSTICE BEATTY:** Governor Henry McMaster issued an order suspending Mohsen Baddourah from his position as a member of the Columbia City Council after Baddourah was indicted for second-degree domestic violence. Baddourah initiated this declaratory judgment action in the circuit court, seeking a determination that (1) he is a member of the Legislative Branch and is, therefore,

excepted from the Governor's suspension power under the South Carolina Constitution; and (2) second-degree domestic violence is not a crime involving moral turpitude, so it is not an act that is within the scope of the Governor's suspension power. The circuit court dismissed Baddourah's complaint on the ground the court lacked subject matter jurisdiction and, alternatively, for failure to state a cause of action. We affirm as modified.

## I. FACTS

Baddourah was elected to his second term representing District 3 on the Columbia City Council, for the period of January 1, 2016 to December 31, 2019. On July 2, 2016, Baddourah was in the midst of a divorce and custody battle when he was arrested for an alleged altercation involving his estranged wife. He was subsequently indicted on a charge of second-degree domestic violence.

On March 13, 2017, the Governor issued Executive Order 2017-05, finding second-degree domestic violence is a crime of moral turpitude[1] and suspending Baddourah from his position as a member of the Columbia City Council pursuant to article VI, section 8 of the South Carolina Constitution "until . . . the above-referenced charge is resolved, at which time further appropriate action will be taken by the undersigned."

After this Court declined to hear Baddourah's challenge to the Executive Order in our original jurisdiction, Baddourah filed a declaratory judgment action in the circuit court in July 2017. Baddourah asserted that, while the Governor may suspend any officer of the state or its political subdivisions who has been indicted for a crime involving moral turpitude, South Carolina's Constitution includes an exception for "members and officers of the Legislative and Judicial Branches," citing S.C. Const. art. VI, § 8. Baddourah sought a determination that (1) he is excepted from the Governor's suspension power under article VI, section 8 because he is a member of the Legislative Branch in his position on the Columbia City Council, and (2) the Executive Order is not enforceable because second-degree domestic violence is not a crime involving moral turpitude. In addition, Baddourah sought a mandatory

---

[1] Prior to the suspension, the Governor sought an opinion from the South Carolina Attorney General's Office as to whether second-degree domestic violence is a crime involving moral turpitude for purposes of the Governor's suspension power under article VI, section 8. The opinion of the Attorney General was "that a court would most likely conclude that domestic violence 2nd degree is a crime of moral turpitude" for this purpose. *See* S.C. Att'y Gen. Op. (Mar. 9, 2017), 2017 WL 1095385, at *1.

injunction staying enforcement of the Executive Order and an award of attorney's fees.

By order filed November 9, 2017, the circuit court granted the Governor's motion to dismiss Baddourah's complaint. The court first ruled dismissal was proper under Rule 12(b)(1), SCRCP, based on a lack of subject matter jurisdiction. The circuit court found the Governor's suspension power is discretionary and under the separation of powers doctrine of the South Carolina Constitution, courts may not review discretionary acts by the Executive Branch, so the Executive Order was not subject to court review.

The circuit court alternatively found that, even accepting Baddourah's factual allegations as true, his complaint failed to state sufficient facts to constitute a cause of action or claim for relief and should, therefore, be dismissed under Rule 12(b)(6), SCRCP. The circuit court found Baddourah's argument that he is a member of the Legislative Branch by virtue of his position on the Columbia City Council was without merit, as the text of the state constitution indicated that "Legislative Branch" was meant to refer to members of the South Carolina General Assembly. The circuit court further found that it "need not reach or decide the question of whether Domestic Violence, Second Degree, constitutes a 'crime involving moral turpitude' for purposes of article VI, section 8," as this phrase is not defined in the text of the state constitution and, therefore, its meaning must be determined by the Governor in his sole discretion.

Baddourah appealed to the court of appeals, and this Court certified the appeal for review pursuant to Rule 204(b), SCACR. *See Baddourah v. McMaster*, Appellate Case No. 2017-002576, S.C. Sup. Ct. Order dated June 16, 2020.

## II. DISCUSSION

On appeal, Baddourah argues the circuit court erred in (1) dismissing his complaint based on a lack of subject matter jurisdiction; (2) alternatively, dismissing the action for failing to state a cause of action, after finding he was not a member of the Legislative Branch; and (3) failing to address whether second-degree domestic violence is a crime of moral turpitude. Baddourah asserts this appeal concerns novel issues that should not have been decided on a motion to dismiss.

As an initial matter, we note that, a few days before oral argument, the Governor submitted supplemental filings indicating both Baddourah's suspension and term of office have ended and suggesting the appeal should be dismissed for

mootness.[2] We decline to dismiss the appeal under the circumstances present here. Baddourah promptly challenged the Executive Order when he was first suspended in 2017, but the litigation continued over an extended period, before this Court's certification of the appeal. Moreover, the appeal concerns issues that are capable of repetition, yet evading review, so they are appropriate for our consideration. The suspension of Baddourah, even if appropriate, resulted in a period of approximately 1.5 years where the residents of District 3 had no representation on the Columbia City Council, so bringing clarity to the questions before the Court is highly desirable for all concerned. *Cf., e.g.*, *Byrd v. Irmo High Sch.*, 321 S.C. 426, 431–32, 468 S.E.2d 861, 864 (1996) (recognizing that a court may take appellate jurisdiction, despite the mootness of a specific case, if the issue raised is a matter that is capable of repetition yet evades review); *id.* at 432, 468 S.E.2d at 864 (observing "[s]hort-term student suspensions, by their very nature, are completed long before an appellate court can review the issues they implicate" and concluding such cases "clearly fit[] into the evading review exception of the mootness doctrine").

## A.     Subject Matter Jurisdiction

Baddourah contends the circuit court erred in dismissing his complaint under Rule 12(b)(1), SCRCP after finding it lacked subject matter jurisdiction to review discretionary acts by the Governor. We agree.

"A court's subject matter jurisdiction is determined by whether it has the authority to hear the type of case in question." *Allison v. W.L. Gore & Assocs.*, 394 S.C. 185, 188, 714 S.E.2d 547, 549 (2011). A judgment is void and without legal effect if a court does not have jurisdiction. *Thomas & Howard Co. v. T.W. Graham & Co.*, 318 S.C. 286, 291, 457 S.E.2d 340, 343 (1995). "The question of subject matter jurisdiction is a question of law for the court." *Capital City Ins. Co. v. BP Staff, Inc.*, 382 S.C. 92, 99, 674 S.E.2d 524, 528 (Ct. App. 2009) (citation omitted).

The subject matter of this declaratory judgment action concerns the Governor's suspension power under the South Carolina Constitution. In particular,

---

[2] In his supplemental filings, the Governor stated Baddourah's indictment was nolle prossed in 2018, after Baddourah completed a pretrial intervention program, and by Executive Order 2018-51, the Governor ended Baddourah's suspension from the Columbia City Council on October 17, 2018. Baddourah served on the Columbia City Council until his term ended on December 31, 2019. This Court certified the appeal in June 2020, but the issue of mootness was not raised until just prior to oral argument in October 2020.

article VI, section 8 states the Governor has the power to suspend officers of the state and its political subdivisions under the following specified conditions:

> Any officer of the State or its political subdivisions, ***except members and officers of the Legislative and Judicial Branches***, who has been indicted by a grand jury for a ***crime involving moral turpitude*** or who has waived such indictment if permitted by law ***may be suspended*** by the Governor until he shall have been acquitted. In case of conviction the office shall be declared vacant and the vacancy filled as may be provided by law.

S.C. Const. art. VI, § 8 (emphasis added).

The circuit court found that, "[b]y using the word 'may,' this provision represents a textual commitment of the question to the Governor, in the exercise of his discretion, and makes clear that the Governor's suspension authority is neither automatic nor ministerial." The circuit court noted courts have jurisdiction to review ministerial acts of the Governor; however, where the Governor's authority is discretionary in nature, courts may not substitute their judicial discretion for that of the executive without violating the separation of powers provision of the South Carolina Constitution. Accordingly, the circuit court found dismissal was proper because it lacked subject matter jurisdiction to consider Baddourah's complaint. *See* S.C. Const. art. I, § 8 ("In the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other.").

We hold the circuit court erred in finding it lacked subject matter jurisdiction in this case. Baddourah alleged the Governor did not have the power to suspend him under article VI, section 8 of the South Carolina Constitution because (1) this provision expressly excepts members of the Legislative Branch, and (2) it only authorizes suspension for a crime of moral turpitude. The circuit court was asked to make legal determinations—whether Baddourah qualifies as a member of the Legislative Branch and whether the offense qualifies as a crime involving moral turpitude. These legal questions involve interpretation of the constitution to determine the extent of the Governor's suspension power, a subject that is appropriate for judicial determination. *See Segars-Andrews v. Judicial Merit Selection Comm'n*, 387 S.C. 109, 123, 691 S.E.2d 453, 461 (2010) ("It is the duty of this Court to interpret and declare the meaning of the constitution."); *Rose v. Beasley*, 327 S.C. 197, 206, 489 S.E.2d 625, 629 (1997) ("Under South Carolina

law, the Governor can neither appoint to office nor suspend or remove from office unless the power to do so is conferred upon him by the Constitution or statute.").

The determination of these legal questions does not implicate the separation of powers clause. Consequently, we hold the circuit court erred in dismissing Baddourah's complaint based on its finding that it lacked subject matter jurisdiction.

## B.     Failure to State a Cause of Action

Baddourah further argues the circuit court erred in alternatively dismissing his action under Rule 12(b)(6), SCRCP, for failing to state a cause of action. The circuit court based this conclusion on two subsidiary findings: (1) Baddourah was not a member of the Legislative Branch and, thus, was not excepted from the Governor's suspension power, and (2) whether second-degree domestic violence qualifies as a crime of moral turpitude was solely within the Governor's discretion and need not be addressed by the courts. We shall address each point in turn.

### 1. Legislative Branch Exception

Baddourah first asserts the circuit court erred in finding he was not excepted from the Governor's suspension power as a member of the "Legislative Branch." We disagree.

The circuit court found "[t]he exclusion of 'members and officers of the Legislative and Judicial Branches' from section 8 of article VI is derived from the separation of powers prescribed in the Constitution of 1895." The court stated, "This separate, tripartite structure is expressly memorialized in article I, section 8, which mandates that . . . the legislative, executive, and judicial powers" of state government "shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other." *See* S.C. Const. art. I, § 8.

The circuit court explained that, by referring to "the legislative, executive, and judicial powers" as the functions "of one of said departments," the constitution's framers were directly referring to the three distinct "Departments" of state government addressed in three separate articles of the constitution. *See* S.C. Const. art. III (entitled, "Legislative Department"); S.C. Const. art. IV (entitled, "Executive Department"); S.C. Const. art. V (entitled, "Judicial Department"). By capitalizing "Legislative and Judicial Branches" in article VI, section 8, the circuit court found, the framers essentially employed defined terms, craving reference to their use elsewhere in the constitution, namely, articles III and V, which address, respectively, the Legislative and Judicial Departments.

The circuit court highlighted the language employed in article III, governing the Legislative Department, which confirms South Carolina's legislative power is vested in "two distinct branches" of state government:

> The **legislative power of this State** shall be vested in **two distinct branches**, the one to be styled the "Senate" and the other the "House of Representatives," and both together the "General Assembly of the State of South Carolina."

S.C. Const. art. III, § 1 (emphasis added).  The circuit court stated:  "[T]he relevant text is unambiguous and does not mention municipal officials or contemplate that they will be viewed as members of the Legislative Branch.  Indeed, municipal government is separately addressed elsewhere in the constitution," citing S.C. Const. art. VIII (entitled, "Local Government").

The circuit court found further support for the conclusion that the term "Legislative Branch" does not include members of municipal councils because the text of other, unrelated constitutional provisions, such as a section addressing the adoption of the constitution and the terms of elected officials, shows the drafters were capable of distinguishing "legislative" officers from other types of officers. *See, e.g.*, S.C. Const. art. XVII, § 11 ("All officers, State, executive, legislative, judicial, circuit, district, County, township and municipal, who may be in office at the adoption of this Constitution . . . shall hold their respective offices until their terms have expired and until their successors are elected or appointed and qualified as provided in this Constitution . . . .").

We find Baddourah, as a member of the Columbia City Council, is a member of a local "legislative body," which has been delegated authority by the state's highest legislative body, the General Assembly.  *See generally Noble v. Ternyik*, 539 P.2d 658, 660 (Or. 1975) (referencing the highest legislative body of a state and "lesser" or "subordinate" legislative bodies to which a state has delegated some legislative power); *Issa v. Benson*, 420 S.W.3d 23, 26–27 (Tenn. Ct. App. 2013) (discussing "subordinate legislative bodies like city councils" that perform some legislative functions).

Baddourah's membership in a local or subordinate "legislative body," however, does not make him a member of the "Legislative Branch" as that term is used in our constitution, nor confer on him all of its attendant functions.  Rather, the meaning must be discerned from the context in which it is used and an examination of other constitutional provisions.  *See generally Carroll v. Town of*

*York*, 109 S.C. 1, 10, 95 S.E. 121, 124 (1918) (holding under the Constitution of 1895, "the legislative branch of the government has the exclusive power of taxation, but may delegate it to towns for municipal purposes, and may therefore restrict the towns in that respect").

The constitutional provisions cited by the circuit court, including the directive governing the separation of powers in article I, section 8 (providing a separation of the legislative, executive, and judicial "powers" in the respective "departments"), as well as our review of other portions of the constitution, leads to the conclusion that the framers' reference to the "Legislative Branch" was intended to refer to the Senate and the House of Representatives (which it denominated the two legislative branches). In other words, the General Assembly. *See* S.C. Const. art. III (governing the "Legislative Department"); art. III, § 1 (indicating the legislative power of the state is vested in two "branches" of state government, the Senate and the House of Representatives, which together comprise the General Assembly).

While Baddourah understandably takes issue with the fact that the constitution did not just simply refer to the "General Assembly" in the exception to the Governor's suspension power, we agree with the circuit court that the genesis for the distinction was respect for the separation of powers provision of article I, section 8. The purpose of the exception in the provision outlining the Governor's suspension power was to prevent the Governor, part of the Executive Branch, from intruding on or removing officers in the Legislative and Judicial Branches,[3] and article VI, section 8 (concerning the Governor's suspension power) echoes the language used in article I.

Various terms have been used to describe the divisions of government. The most common descriptions, however, refer to the executive, legislative, and judicial "branches" of government. *See Sloan v. Sanford*, 357 S.C. 431, 436, 593 S.E.2d 470, 473 (2004) (discussing "the separation of powers of the three branches of government, that is, [the need] to keep the ***executive, judicial, and legislative branches*** of government separate" (emphasis added)). This Court, recognizing the importance of the separation of the three co-equal branches of government, recently changed its public denomination from the Judicial

---

[3] For example, the General Assembly has its own procedures for the punishment and expulsion of officers. *See* S.C. Const. art. III, § 12 ("Each house shall . . . punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member . . . .").

Department to the Judicial Branch to better conform with this prevailing terminology and to disabuse the public of the notion that the Judicial Department/Branch is a department within the Executive Department/Branch. For all the foregoing reasons, we hold the circuit court did not err in finding Baddourah was not a member of the Legislative Branch and, thus, was not excepted from the Governor's suspension power.

## 2. Crimes Involving Moral Turpitude

Baddourah next argues the circuit court erred in dismissing his complaint under Rule 12(b)(6), SCRCP for failing to state a cause of action, after finding the question of whether the offense charged was a crime involving moral turpitude need not be addressed by the courts. We agree.

In dismissing Baddourah's complaint for a declaratory judgment, the circuit court found that it "need not reach or decide the question of whether" second-degree domestic violence constitutes a crime involving moral turpitude for purposes of article VI, section 8. The court reasoned that, because this phrase is not defined in the text of the South Carolina Constitution, its application must be left solely to the determination of the Governor in the exercise of his discretion, citing *McConnell v. Haley*, 393 S.C. 136, 138, 711 S.E.2d 886, 887 (2011) ("Because there is no indication in the Constitution as to what constitutes an 'extraordinary occasion' to justify an extra session of the General Assembly, this matter must be left to the discretion of the Governor and this Court may not review that decision."). The circuit court found this was particularly true where the Governor had requested and obtained an Attorney General opinion, which had confirmed the Governor's conclusion that second-degree domestic violence qualified as a crime of moral turpitude for purposes of article VI, section 8. *See supra* note 1. As a result, the circuit court stated, "it cannot be said that [the Governor's] exercise of his discretion to temporarily suspend [Baddourah] was arbitrary."

## (a) Propriety of Court Ruling on Offense

Baddourah first asserts the circuit court erred in failing to address his contention that second-degree domestic violence is not a crime of moral turpitude. Baddourah states that, although the circuit court refused to address the question, the Governor argued in his motion to dismiss that the offense is a crime of moral turpitude, yet did "not cite a single case where a South Carolina court has determined this." Baddourah also asserts the circuit court erred in relying on *McConnell* to rule that a term addressing the Governor's authority is discretionary where it is not defined in the constitution, as the circumstances here are distinguishable. We agree.

Baddourah maintains that, while it is not defined in the constitution, the concept of "a crime of moral turpitude," in contrast to the situation in *McConnell*, is a recognized term of art that has been ruled on by numerous jurisdictions. He opines that "it would be an absurd result if the Governor and the [AG] can review and interpret the case law on what constitutes a crime of moral turpitude, but the court whose primary job it is to interpret the law cannot."

In response, the Governor contends "the circuit court properly rejected [Baddourah's] latest attempt to litigate the underlying criminal charge against him by declining to address specifically whether [Baddourah's] indictment for Domestic Violence, Second Degree charges a 'crime involving moral turpitude.'" The Governor maintains the circuit court correctly found the term was undefined in the constitution, so its definition must be left solely to his discretion. We disagree.

We find the circuit court erred in failing to address whether second-degree domestic violence is a crime involving moral turpitude. Baddourah is not attempting to litigate his criminal charge (which the Governor acknowledges has been dismissed, see *supra* note 2). We do agree that the Governor's exercise of his suspension power is a matter left to his sole discretion. However, defining terms used in the state's constitution is not. It is well settled that the interpretation of the state's constitution is a matter for the courts. The interpretation of the constitution necessarily requires defining the meaning of its terms.

The Governor's exercise of his suspension power is predicated on the constitution, which provides the Governor can suspend any officer of the state or its political subdivisions who has been indicted for a crime of moral turpitude, unless the individual is a member or officer of the Legislative or Judicial Branches. Because we have concluded Baddourah is not a member of the Legislative Branch, the only question remaining is whether the offense is one involving moral turpitude. This point is dispositive because it determines if the Governor had the requisite authority to issue the suspension order.

A crime of moral turpitude is a term of art that has been defined by South Carolina law, and whether an offense qualifies as a crime of moral turpitude is a question that is appropriate for the courts, contrary to the ruling of the circuit court.[4]

---

[4] To the extent the circuit court relied on *McConnell* in finding the issue was not appropriate for determination by the courts, we find *McConnell* involved a distinguishable situation that ultimately did not turn on the point for which it was cited by the circuit court. *McConnell* focused on a constitutional provision stating "[t]he Governor may ***on extraordinary occasions*** convene the General Assembly

*See State v. Yates*, 280 S.C. 29, 37, 310 S.E.2d 805, 810 (1982) ("Whether a particular offense constitutes a crime of moral turpitude has been developed in South Carolina on a case by case basis as a matter of common law."), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991); *see also State v. Major*, 301 S.C. 181, 184, 391 S.E.2d 235, 237 (1990) (stating "[i]n determining whether a crime is one involving moral turpitude, the Court focuses primarily on the duty to society and fellow men which is breached by the commission of the crime" (alteration in original) (citation omitted)).

Because the circuit court did not rule on this novel question, Baddourah asks the Court to address his argument that second-degree domestic violence is not a crime involving moral turpitude. Due to the lengthy period of time this action has been pending in the courts and the desirability of bringing closure to the parties, we do so in the interest of judicial economy. We begin by reviewing, as a logical starting point, the origins of the term "crimes involving moral turpitude."

### (b) Development of "Crimes Involving Moral Turpitude"

"Moral turpitude" has been present in the law of the United States for well over two centuries. Julia Ann Simon-Kerr, *Moral Turpitude*, 2012 Utah L. Rev. 1001, 1002 (2012). The beginning of its development can be traced to social and political discourse in the early nineteenth century, when recitations about the "honor"—or lack thereof—of public figures shaped the political landscape. *Id.* at 1010–11. Because the government had not yet developed institutional routines, reputation was a key factor used in the early Republic to judge individuals, and "moral turpitude" became a term for characterizing their conduct. *See id.* at 1011. The phrase "moral turpitude" appeared in the published letters, pamphlets, speeches, and private correspondence of many notable political figures of the time; it was a

---

in *extra* session." *McConnell*, 393 S.C. at 138, 711 S.E.2d at 887 (emphasis added by the Court). While the Court held the term "extraordinary occasion" must, of necessity, be left to the Governor's discretion since it was undefined in the constitution, the Court's decision actually turned on the meaning of an "extra" session, which the Court recognized has a readily discernible meaning, i.e., the Governor cannot convene an "extra" session when the General Assembly is already in session and has not adjourned *sine die*. *Id.*

term denoting "honor's opposite" and was a concept taken from classical thinkers such as Cicero, a figure the nation's founders admired.[5]  *Id.* at 1010–11.

This concept naturally extended to the law of defamation because printed statements of dishonor "could 'damn[] a man's reputation for all time.'"  *Id.* at 1011 (alteration in original) (citation omitted).  English law had already established "the rough principle" that spoken words implying a plaintiff was guilty of a crime punishable by imprisonment was actionable per se, i.e., without proof of damages.  *Id.* at 1016.  American courts struggled to define the boundaries of the English rule, such as whether the line should be drawn between felonies and misdemeanors, or by the term of punishment.  *Id.*  In these circumstances, the "nascent American legal system" attempted "to invent a new rule for an old tort."  *Id.*  The New York Supreme Court did so in 1809, in *Brooker v. Coffin*, 5 Johns. 188, 191–92 (N.Y. Sup. Ct. 1809), when it adopted the rule that a crime would be deemed actionable as slander per se if the words, if true, would result in indictment for a crime involving moral turpitude or subject a person to an infamous punishment.  *Id.* at 1016–17.  The New York court noted a "contradiction of cases" then existed, and it believed its rule would provide a suitable criterion; however, the court did not actually define moral turpitude in its opinion.  *Brooker*, 5 Johns. at 192.

Over forty-five years later, after numerous courts had failed to come to a consensus and there was still no treatise or legal dictionary that defined moral turpitude, the Supreme Court of Tennessee turned to the definition in Webster's Dictionary, which stated "[m]oral turpitude is said to imply 'inherent baseness or vileness of principle in the human heart; extreme depravity.'"  *See* Simon-Kerr, *supra*, at 1022 & 1022 n.155 (alteration in original) (quoting *Smith v. Smith*, 34 Tenn. (2 Sneed) 473, 479 (1855)).  The Tennessee court's definition from Webster's "provided a lasting definition that could be and often was quoted in cases necessitating a moral turpitude analysis," and "it was [eventually] incorporated almost verbatim into law treatises."  *Id.* at 1022 n.155.

---

[5] In 45 B.C., the Roman philosopher Marcus Tullius Cicero, in his multi-volume work, *De Finibus Bonorum et Malorum* (i.e., On the Ends of Good and Evil), equated virtue with moral excellency and described moral turpitude as a most undesirable trait:  "[A]s virtue or moral excellency is for itself to be valued and desired, so vice or moral turpitude is to be hated and avoided."  Simon-Kerr, *supra*, at 1011 & n.75 (citing an 1812 translation, 3 Cicero, *De Finibus Bonorum et Malorum* 158 (Jeremy Collier, ed., Samuel Parker, trans., 1812)).

The application of moral turpitude was also extended to the law of evidence, where it was used to evaluate witness impeachment issues based on the reasoning that "evidence of a person's reputation was relevant to his or her credibility." *Id.* at 1025–26. By the late nineteenth century, many courts "had endorsed formal rules permitting evidence of crimes or acts involving moral turpitude for impeachment[.]" *Id.* at 1026. However, in contrast to its use for the law of defamation, "moral turpitude proved an uneasy fit as a standard for impeachment evidence." *Id.* Observers have noted that the difficulty lies in the fact that there is a difference between "character," which is what a person *really is*, and "reputation," which is what a person *seems to be*. *Id.* As evidentiary rules matured, courts criticized the moral turpitude standard as indeterminate, noting it "often did mire courts in a definitional morass." *Id.* at 1027, 1033. After Congress's adoption of the Federal Rules of Evidence in 1975, most, but not all, states abandoned moral turpitude as an evidence standard and turned to an analysis based on (1) the length of the sentence or (2) whether the offense involved dishonesty or a false statement, regardless of the punishment.[6] *See id.* at 1027, 1034.

Moral turpitude was also appropriated for use in other fields, such as voting rights,[7] juror disqualification, professional licensing, and immigration law. *Id.* at 1001; *see also* Note, *Crimes Involving Moral Turpitude*, 43 Harv. L. Rev. 117, 118 (1929) (stating that, in addition to defamation and the credibility of witnesses, the phrase "crimes involving moral turpitude" is one that "has been widely employed[] in legislation dealing with immigration, disbarment, [and the] revocation of physicians' licenses" (footnotes omitted)). In these contexts, its function changed to

---

[6] South Carolina echoes the federal rule. *See* Rule 609(a), SCRE (allowing impeachment with evidence of (1) a conviction for a crime that is punishable by death or imprisonment in excess of one year, or (2) a crime involving dishonesty or false statement, regardless of the punishment).

[7] "In 1877, Georgia passed the first constitutional amendment to overtly use the moral turpitude standard as a disenfranchisement tool." Simon-Kerr, *supra*, at 1041–42. South Carolina and Alabama "also passed laws aimed at disenfranchising black men by discriminating against certain offenses." *Id.* at 1041. However, the United States Supreme Court held Alabama's constitutional provision violated the Equal Protection Clause of the Fourteenth Amendment, where the particular offenses selected for classification by state registrars as crimes of moral turpitude disenfranchised approximately ten times more black voters than white. *Id.* at 1043 (citing *Hunter v. Underwood*, 471 U.S. 222, 226–33 (1985)).

being a standard "to judge character instead of reputational harm."  Simon-Kerr, *supra*, at 1002.

Despite this development across various fields, the term "moral turpitude" is not without its detractors.  Judge Richard Posner, formerly one of the leading appellate judges in the nation and a legal professor, has observed that the words base, vile, depraved, and turpitude have virtually disappeared from the modern American vocabulary, leaving courts to grapple with antiquated "legalese."  *Arias v. Lynch*, 834 F.3d 823, 831–32 (7th Cir. 2016) (Posner, J., concurring).  While there are some guidelines for its application, the moral turpitude standard lacks absolute precision in American law.[8]

Ultimately, this lack of precision might be inherent in a concept based on contemporary standards of community morality.  Commentator Simon-Kerr has compared the difficulty in applying the moral turpitude standard to the test for obscenity, which also focuses on community morality standards and has likewise eluded certainty.  Simon-Kerr, *supra*, at 1003 n.15.  "As framed in 1957, the [obscenity] test asks 'whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest.'"  *Id.* (quoting *Roth v. United States*, 354 U.S. 476, 489 (1957)).  Simon-Kerr stated this test "provoked Justice [Potter] Stewart's famous comments about pornography":

> I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so.  But I know it when I see it . . . .

*Id.* (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring)).  We hasten to add, however, that while crimes involving moral turpitude have continued to evolve over the last two centuries (there was, for example, no such thing as trafficking in crack cocaine in the early days of the Republic), and there has been some disagreement in the conclusions as to specific crimes among jurisdictions, there is a recognized framework for its application.

---

[8] Judge Posner remarked, "It is preposterous that that stale, antiquated, and, worse, meaningless phrase [moral turpitude] should continue to be a part of American law."  *Arias*, 834 F.3d at 830 (Posner, J., concurring).

### (c) Crimes Involving Moral Turpitude in South Carolina

With this backdrop, it is evident that moral turpitude has long been used, in many contexts, as a legal term of art. South Carolina has applied a traditional framework, defining moral turpitude as "an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." *See State v. Horton*, 271 S.C. 413, 414, 248 S.E.2d 263, 263 (1978) (citation omitted).

Although descriptions have varied among jurisdictions since the nineteenth century, this definition is currently the most common one appearing in court opinions and law journals. Lindsay M. Kornegay & Evan Tsen Lee, *Why Deporting Immigrants for "Crimes Involving Moral Turpitude" Is Now Unconstitutional*, 13 Duke J. Const. L. & Pub. Pol'y 47, 57 & n.56 (2017) (arguing moral turpitude is impermissibly vague and noting this definition, is the most prevalent, however, and appears in *Moral turpitude*, Black's Law Dictionary (9th ed. 2009)); *see also Arias*, 834 F.3d at 831 (Posner, J., concurring) (noting Congress had never defined "moral turpitude," but courts and immigration agencies have tended to cite a variation of the definition in *Black's Law Dictionary*).

South Carolina courts have not required that an offense be a felony to qualify as a crime involving moral turpitude. *See State v. Harris*, 293 S.C. 75, 76, 358 S.E.2d 713, 714 (1987) ("***While not determinative***, it is also significant that the legislature has categorized the crime as a felony." (emphasis added)). Further, we have pointed out that, "[w]hile all crimes involve some degree of social irresponsibility, all crimes do not involve moral turpitude." *State v. LaBarge*, 275 S.C. 168, 172, 268 S.E.2d 278, 280 (1980).

Making the issue somewhat more complex, South Carolina courts have held that whether some offenses are a crime involving moral turpitude can depend on the facts of the case. In those cases, determining whether an offense qualifies as a crime involving moral turpitude involves consideration of the nature of the crime as defined by law as well as the particularized facts contained in the indictment. *See, e.g., State v. Bailey,* 275 S.C. 444, 446, 272 S.E.2d 439, 440 (1980) (observing whether assault and battery of a high and aggravated nature is a crime of moral turpitude depends upon the facts of the particular case as set forth in the indictment); *id.* ("Proof of the nature of a prior conviction must necessarily be confined to the inherent nature of the crime as defined by law and particularized by the indictment."); *see also In re Lee*, 313 S.C. 142, 143–44, 437 S.E.2d 85, 86 (1993) (stating "while the crimes of misconduct in office, assault of a high and aggravated

nature, and assault and battery of a high and aggravated nature are not always crimes of moral turpitude, they may be depending on the facts as particularized in the indictment"); *State v. Hall*, 306 S.C. 293, 295, 411 S.E.2d 441, 442 (Ct. App. 1991) (holding whether resisting arrest "is a crime of moral turpitude depends upon the facts of the case"; specifically, whether the resistance was violent).

This Court has also stated that crimes involving primarily self-destructive behavior generally do not implicate moral turpitude; rather, "[i]n determining whether a crime is one involving moral turpitude, the Court focuses primarily on the duty to society and fellow man which is breached by the commission of the crime." *State v. Ball*, 292 S.C. 71, 73–74, 354 S.E.2d 906, 908 (1987), *overruled on other grounds by State v. Major*, 301 S.C. 181, 184, 391 S.E.2d 235, 237 (1990) (retaining the test for moral turpitude stated in *Ball* but overruling *Ball* because of its holding regarding cocaine possession and stating that, because "any involvement with cocaine contributes to the destruction of ordered society," mere possession of cocaine is a crime of moral turpitude).

In *Ball*, the Court outlined some offenses that have been deemed crimes involving moral turpitude in South Carolina under the foregoing test: accessory to bank robbery, arson, assault and battery with intent to kill, assault with intent to rape, assault with intent to ravish, auto theft, breaking into a motor vehicle with intent to steal, conspiracy to obtain property under false pretense, criminal sexual conduct with a minor (any degree), failure to yield right of way, hit and run, housebreaking and larceny, larceny, manufacture of marijuana, possession of marijuana with intent to distribute, receiving stolen goods, robbery, sale of controlled substances, sale of narcotics, and tax fraud. *Id.* In contrast, the Court noted the following had not been deemed crimes involving moral turpitude: bookmaking, disorderly conduct, illegal possession of prescription drugs, possession of an unlawful weapon, public drunkenness, and simple possession of marijuana. *Id.* at 74, 354 S.E.2d at 908.

### (d) Second-Degree Domestic Violence

We turn now to the particular offense with which Baddourah was charged, second-degree domestic violence.

Domestic violence is generally defined in subsection 16-25-20(A) of the South Carolina Code as follows:

> (A) It is unlawful to:
>
> > (1) cause physical harm or injury to a person's own household member; or

(2) offer or attempt to cause physical harm or injury to a person's own household member with apparent present ability under circumstances reasonably creating fear of imminent peril.

S.C. Code Ann. § 16-25-20(A) (Supp. 2020). Subsection (C) provides a person commits the offense of domestic violence in the second degree if the person violates subsection (A) and any of several enumerated alternatives set forth in subsection (C). *Id.* § 16-25-20(C). Alternative (1) states, "[M]oderate bodily injury to the person's own household member results or the act is accomplished by means likely to result in moderate bodily injury to the person's own household member."[9] *Id.* § 16-25-20(C)(1).

The indictment charging Baddourah with second-degree domestic violence alleged, in relevant part, that he "did . . . cause physical harm or injury to a household member, [his spouse], or did offer or attempt to cause physical harm or injury . . . , with apparent present ability under circumstances reasonably creating fear of imminent peril by ***striking [his spouse] with a car door***[,] an act likely to result in moderate bodily injury." (Emphasis added.)

Baddourah argues his offense, allegedly striking his spouse with a car door, did not involve "severe" injury,[10] and he urges this Court to require offenses

---

[9] Section 16-25-10 defines the term "moderate bodily injury" as follows:

> "Moderate bodily injury" means physical injury that involves prolonged loss of consciousness or that causes temporary or moderate disfigurement or temporary loss of the function of a bodily member or organ or injury that requires medical treatment when the treatment requires the use of regional or general anesthesia or injury that results in a fracture or dislocation. Moderate bodily injury does not include one-time treatment and subsequent observation of scratches, cuts, abrasions, bruises, burns, splinters, or any other minor injuries that do not ordinarily require extensive medical care.

S.C. Code Ann. § 16-25-10(4) (Supp. 2020).

[10] Baddourah maintains his wife grabbed his iPhone and was attempting to shut and lock her car door and leave with his phone, so he grabbed the door to keep it from

involving moral turpitude to be limited to "extremely grave acts of violence and depravity" or offenses that are *malum in se*. For support, Baddourah cites *Tucker v. Oklahoma*, in which the Oklahoma court discussed various definitions of moral turpitude and noted that it had previously "applied an Eighth Circuit definition which restricted moral turpitude to 'the gravest offenses–felonies, infamous crimes, those that are *malum in se*.'" 395 P.3d 1, 5 (Okla. Crim. App. 2016) (citation omitted). The Oklahoma court reasoned, "It is difficult to characterize domestic violence as a *malum in se* crime, or one recognized as inherently evil and immoral, given that for centuries it was not recognized as a crime at all, and only recently has our Legislature granted it felony status." *Id.* The Oklahoma Court noted the State had not presented a compelling reason "to expand the definition of 'moral turpitude' and to separate domestic assault and battery from the well-settled law that assault and battery is not a crime of moral turpitude." *Id.*

We decline Baddourah's suggestion to require a threshold of "extremely grave acts of violence and depravity" or to restrict our analysis to *malum in se* offenses. As discussed above, the measure of moral turpitude in South Carolina is not based on the severity of physical injury, as even offenses that do not involve physical harm or felonies have been designated as crimes of moral turpitude. *See generally Ball*, 292 S.C. at 73–74, 354 S.E.2d at 908 (summarizing offenses). Moreover, we reject the Oklahoma court's reasoning that the past failure to recognize the significant danger of domestic violence to household members, as well as its impact on children and other societal harm, somehow justifies insulating it from classification under contemporary standards as a crime involving moral turpitude.

Under South Carolina's moral turpitude framework, we focus "primarily on the duty to society and fellow man [that] is breached by the commission of the crime." *Ball*, 292 S.C. at 74, 354 S.E.2d at 908. According to the Centers for Disease Control and Prevention ("CDC"), domestic violence affects millions of people in the United States each year, ranging from one episode to severe, chronic abuse over multiple years. CDC, *Preventing Intimate Partner Violence* (2020 Fact Sheet), https://www.cdc.gov/violenceprevention/pdf/ipv/IPV-factsheet_2020_508. pdf. About 1 in 4 women and nearly 1 in 10 men in the United States have experienced physical or sexual violence and/or stalking by an intimate partner during their lifetime, and over 43 million women and 38 million men have experienced psychological aggression by a partner. *Id.* (citing data from the CDC's

---

shutting. Baddourah's wife, in contrast, maintained Baddourah shut the door, causing her to sustain injuries.

National Intimate Partner and Sexual Violence Survey, 2015 Data Brief–Updated Release).

In South Carolina, domestic violence occurs at rates far exceeding the national average, as evidenced by annual statistics compiled by organizations such as the National Coalition Against Domestic Violence ("NCADV"). *See* NCADV, *State-by-State Statistics on Domestic Violence*, https://ncadv.org/state-by-state (last visited Jan. 5, 2021). A fact sheet published by the NCADV indicates 41.5% of South Carolina women and 17.4% of South Carolina men experience physical or sexual violence and/or stalking by an intimate partner in their lifetimes. NCADV, *Domestic Violence in South Carolina*, https://assets.speakcdn.com/assets/2497/south_carolina_2019.pdf (last visited Jan. 5, 2021). In 2011, South Carolina had the highest rate of women murdered by men in the United States, more than double the national average. *Id.* In 2012, South Carolina had the second highest rate of women murdered by men. *Id.*

In its most recent annual report (its 23rd), the Violence Policy Center ("VPC") notes that, nationwide, 92% of women murdered by men are killed by someone they know, and it lists South Carolina as number 11 in a ranking of states for the killing of women by men, based on 2018 FBI data. *See* VPC, *When Men Murder Women, An Analysis of 2018 Homicide Data* (Sept. 2020), https://vpc.org/studies/wmmw2020.pdf. For over two decades, South Carolina had consistently ranked in the top 10 worst states in the United States in the VPC's annual reports, and it topped the list in four of those years. *See id.*; *see also* South Carolina Domestic Violence Advisory Committee, *S.C. Domestic Violence Advisory Committee 2018 Annual Report* 1 (Mar. 27, 2019), https://dc.statelibrary.sc.gov/handle/10827/29954.

In 2015, the South Carolina General Assembly passed the Domestic Violence Reform Act, which increased penalties for domestic violence, with the aim of curbing these alarming statistics. *See generally* Christina L. Myers, *South Carolina still near bottom in violence against women*, A.P. News (Feb. 11, 2019), https://apnews.com/article/af9c4ee9c722496398f20d6e234d172e.

In light of the prevalence of domestic violence nationally, and the overwhelming statistics for South Carolina in particular, there can be no doubt that domestic violence is an affront to the fundamental sanctity of the home and society. Accordingly, we find the more persuasive view is that domestic violence, with its inherent violation of a special relationship, can qualify as a crime of moral turpitude. *See California v. Burton*, 196 Cal. Rptr. 3d 392, 397 & n.8 (Ct. App. 2015) (stating where the assailant is in a special relationship with the victim, "for which society

rationally demands, and the victim may reasonably expect, stability and safety," and then commits a willful act upon the victim in violation of that relationship, it "necessarily connotes the general readiness to do evil that has been held to define moral turpitude" (citation omitted)); *cf. Major*, 301 S.C. at 184, 391 S.E.2d at 237 (holding that, because "cocaine contributes to the destruction of ordered society," mere possession of cocaine is a crime of moral turpitude).

Turning to the specific offense for which Baddourah was indicted, second-degree domestic violence, we examine its statutory definition and consider the facts alleged in the indictment, in which Baddourah was charged with "striking [his spouse] with a car door[,] an act likely to result in moderate bodily injury." *Cf. Bailey,* 275 S.C. at 446, 272 S.E.2d at 440 (observing some offenses are not invariably crimes of moral turpitude, so a court must look to not only the statutory definition of an offense, but also the particularized facts alleged in the indictment to determine whether an offense qualifies as an offense involving moral turpitude); *In re Lee*, 313 S.C. at 143–44, 437 S.E.2d at 86 (stating some crimes "may be [crimes involving moral turpitude] depending on the facts as particularized in the indictment"). Under the circumstances presented here, in which it is alleged that an individual engaged in conduct that was "likely to result in moderate bodily injury," we conclude the charge of second-degree domestic violence qualifies as a crime involving moral turpitude.[11]

Because we find Baddourah's indictment charged a crime involving moral turpitude, we hold the Governor had the constitutional authority to issue the Executive Order suspending Baddourah from his position as a member of the Columbia City Council. Although Baddourah disputes whether the suspension was warranted, where the Governor is constitutionally authorized to impose a suspension, the decision whether to do so is a matter committed to the Governor's discretion after considering all of the attendant circumstances. Consequently, the circuit court's order dismissing Baddourah's challenge to the suspension order is affirmed as modified.

### III. CONCLUSION

We conclude the Governor acted within the scope of his authority in issuing the Executive Order suspending Baddourah from the Columbia City Council. As a

---

[11] Our holding today is limited to the issue before the Court, a charge of second-degree domestic violence involving an allegation of physical violence "likely to result in moderate bodily injury."

result, the order of the circuit court is affirmed as modified.

**AFFIRMED AS MODIFIED.**

**KITTREDGE, HEARN, FEW, and JAMES, JJ., concur.**